IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| AT&T MOBILITY LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:25-cv-02941 |
| | § | |
| BBB NATIONAL PROGRAMS, INC., | § | |
| | § | |
| Defendant. | § | |

**COMPLAINT FOR DECLARATORY RELIEF**

The National Advertising Division of BBB National Programs recently sent a cease-and-desist letter to AT&T regarding its advertising. That letter attacks AT&T for a TV advertisement that identifies T-Mobile as the "most challenged for deceptive ads" and a press release referencing, in one sentence, that NAD asked T-Mobile to correct its marketing claims 16 times over the last four years. NAD demands that AT&T immediately and permanently pull its TV commercials and press release. Through this cease-and-desist letter, NAD has subjected AT&T to a credible threat of imminent litigation.

But NAD did not stop with a cease-and-desist letter to AT&T. It simultaneously issued its own nationwide press release accusing AT&T of violating NAD's procedures and intentionally implying that AT&T mischaracterized NAD's prior decisions about T-Mobile's deceptive advertising.  Neither are true, and now, NAD's inaccurate accusations have

influenced multiple TV networks to pause running AT&T's advertisements. AT&T seeks a declaratory judgment from this Court to set the record straight.

AT&T's statements summarizing NAD's publicly reported findings against T-Mobile are accurate. In the last four years, NAD has issued *16 decisions* finding that T-Mobile's advertisements or other marketing claims were false, misleading, and/or unsubstantiated. Each was announced by NAD in a public press release, and in each case, NAD's press release summarized both the substance of NAD's findings and the corrections that T-Mobile was required to make to render its claims fair and accurate. This remarkable number is more than the number of adverse decisions received by any of T-Mobile's competitors during the same period, including AT&T, and it is more than the number of adverse decisions issued in the *entire* consumer electronics industry or in the *entire* financial sector over the same four years.

The notion that a court would prohibit a company from making true, non-misleading, and non-confidential statements to the public—on a matter of great concern to tens of millions of consumers—is anathema to the values embodied in the First Amendment. AT&T brings this case for the purpose of obtaining from the Court a declaration that it has not violated NAD's procedures. Specifically, AT&T asks the Court to issue a declaratory judgment that (1) AT&T's advertising does not violate NAD's procedures, to the extent they apply, and (2) NAD has no legal basis to enforce its demand for censorship.

NAD describes its own purpose: "to build consumer trust in advertising and support

fair competition in the marketplace." Yet NAD now takes the remarkable position that any former participant in an NAD proceeding is forever barred from truthfully referencing NAD's own public findings about a competitor's deceptive advertising. This position contradicts NAD's stated mission—consumer trust requires more transparency about deceptive advertising, not enforced silence.

The facts surrounding T-Mobile's historical advertising strategy—and NAD's fruitless efforts to correct it—illustrate the absurdity of NAD's criticism of AT&T. Over the past several years, NAD has repeatedly deemed T-Mobile's ads to be misleading, false, or unsubstantiated. But over and over, T-Mobile has gamed the system to avoid timely redressing its behavior. NAD's process is often slow, and T-Mobile knows it can make that process even slower by asking for extensions and delaying fixes. As a practical matter, this strategy keeps T-Mobile's deceptive advertisements on the air for months, allowing T-Mobile to continue misleading consumers while avoiding meaningful consequences.

Unfortunately, NAD's adjudication process is broken. Even when NAD has issued decisions finding T-Mobile's advertisements deceptive, NAD has repeatedly failed to refer continued violations to the FTC, as NAD's own rules allow and the rules of the National Advertising Review Board require. But it is one thing for NAD to prove ineffective at stopping deceptive advertising. It is quite another for NAD to demand, privately and publicly, that AT&T censor its own truthful statements about T-Mobile's deceptive advertising history—

information that NAD itself disseminated to the public.

T-Mobile may market itself as "the un-carrier," but its actions speak louder than its words. In reality, it has become the un-truthful carrier, with a commitment to using tactics like false "price locks" to lure customers in, only to raise what customers must pay after they sign up. T-Mobile touts its supposedly market-leading network reliability despite NAD's findings that the studies on which T-Mobile relies do not support those claims.

The public deserves to know the truth, so AT&T's advertisements provide that truth:



The fact that a lawsuit against AT&T for truthful speech would be dead on arrival doesn't mean NAD won't file one. AT&T therefore seeks this Court's declaration that it has the right to speak truthfully about matters of public concern, particularly when that speech consists entirely of facts that NAD itself has made public.

**PARTIES**

1.      Plaintiff AT&T Mobility LLC is a limited liability company organized under the laws of Delaware, with its principal place of business in Atlanta, Georgia.

2.      On information and belief, Defendant BBB National Programs Inc. is a 501(c)(6) organization incorporated in Delaware with its principal place of business in McLean, Virginia. BBB National Programs "is an independent, nonprofit organization with a shared history, but not affiliated with, the International Association of Better Business Bureaus." *See* BBB National Programs, Frequently Asked Questions, *available at* https://tinyurl.com/2en5b9fu. BBB National Programs "is home to the independent, industry self-regulation programs that were a part of" the Council of International Business Bureaus "since the 70's." *Id.* NAD is a part of BBB National Programs.

**JURISDICTION AND VENUE**

3.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because AT&T seeks a declaration of its rights under the U.S. Constitution. The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) because the state-law claims arise from a common nucleus of operative fact.

4.      This Court has personal jurisdiction over BBB National Programs because BBB National Programs, through NAD, purposefully directed its conduct at the state of Texas. NAD sent its cease-and-desist letter—issued on BBB National Programs letterhead—to two

individuals employed by AT&T, one of whom resides in the Northern District of Texas, and AT&T received that letter at its principal place of business in the Northern District of Texas. In addition, AT&T seeks a declaration here that it had the right to issue its October 23, 2025 press release, which was issued by AT&T from Dallas, Texas.[1]  And the advertising campaign NAD's cease-and-desist letter targets was formulated in part and approved by AT&T employees in the Northern District of Texas. The BBB National Programs' actions will have substantial effects in Texas. NAD seeks to muzzle free speech that emanates in part from AT&T employees located in the Northern District of Texas.

5.     Moreover, on information and belief, BBB National Programs and NAD have had substantial contacts with Texas through the adjudication of complaints from Texas businesses and consumers. Representatives of NAD, including senior NAD executives, have spoken on NAD's work in Texas on multiple occasions in recent years, including in the Northern District of Texas.

6.     Further still, NAD has a practice of monitoring nationwide advertising and pursuing sua sponte challenges against Dallas, Texas based companies.

---

[1]    The press release notes its issuance from Dallas. https://about.att.com/story/2025/att-stands-up-for-consumers.html.

7.     AT&T's claims arise out of and relate to BBB National Programs' activities in Texas.

8.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a "substantial part of the events or omissions giving rise to the claim occurred" in the Northern District of Texas.

## BACKGROUND

### I.    AT&T's advertising campaign stands up for truth and consumer transparency.

9.     On October 23, 2025, AT&T launched a national, multi-channel advertising campaign promoting its wireless offerings and calling out T-Mobile's persistent record of deceptive marketing. The campaign was announced via press release and rolled out across television, digital, and social-media platforms. It was designed not only to highlight AT&T's reliability, but also to expose T-Mobile's pattern of misconduct that NAD's weakened oversight has failed to curb.

10.    One of the campaign's flagship spots—titled "Ain't Our First Rodeo"—features an actor emphasizing AT&T's dependability and contrasting it with the practices of its competitors, particularly T-Mobile. In the advertisement, the actor notes that T-Mobile is "caught up in un-truths," and displays an image showing "T-Mobile Most Challenged for Deceptive Ads," with a note that this claim is "based on advertising challenges of telecommunications providers brought by competitors from 2022-2025." The advertisement

does not mention NAD by name, identify the number of times T-Mobile has been found to have engaged in problematic advertising, or discuss the outcome of any specific challenge against T-Mobile.[2]

11.    AT&T's press release announcing the advertising campaign stated that "T-Mobile is the most challenged for deceptive ads," and explained that "The Better Business Bureau's advertising watchdog asked T-Mobile to correct their marketing claims 16 times over the last four years. That's more than each of the entire consumer-electronics and financial-services industries." Like the television advertisement, it does not address the details of any specific decision or written document issued by NAD.

12.    AT&T's advertisements and press release do not reveal any information that was not already public through NAD's own press releases.

13.    AT&T's advertisement and press release were truthful and not misleading. As reflected in NAD's own public record, NAD has repeatedly recommended that T-Mobile modify or discontinue its advertising claims. From 2022 through 2025 alone, NAD or its appellate body, the National Advertising Review Board (NARB), recommended changes in at least 16 T-Mobile matters, each of which NAD announced publicly.

---

[2]    The advertisement can be found here: https://www.youtube.com/watch?v=0EHkISq0p9Q.

## II.    NAD has repeatedly concluded that T-Mobile's advertisements should be revised or discontinued.

14.    On at least 16 occasions since January 1, 2022, NAD or NARB announced a decision concluding that T-Mobile's advertising ran afoul of NAD's standard for true and non-misleading material. And on each of those 16 occasions, NAD or NARB issued a press release publicly announcing the factual basis for its decision.

15.    On February 24, 2022, NAD announced that an NARB panel agreed with a decision from NAD that T-Mobile should "discontinue all claims that it has the most reliable 5G network according to third-party testimony company, umlaut." NAD based this recommendation on the fact that the umlaut study only measured "two coverage metrics and one speed metric," and while "speed and coverage are important to consider when talking about 5G network reliability, speed and coverage alone cannot support a reliability claim."[3] On appeal, the NARB panel agreed that "to the reasonable consumer, reliability is a metric that is distinct from coverage and speed even if those two metrics may properly be part of the assessment of reliability."

---

[3]    *National Advertising Review Board Recommends T-Mobile Discontinue Most Reliable 5G Network According to umlaut Claims*, BBB NATIONAL PROGRAMS: DECISION SUMMARIES (Feb. 24, 2022) (Challenge No. 7001/296), https://bbbprograms.org/media/newsroom/decisions/tmobile-most-reliable-5g-umlaut-claims.

16.    On March 17, 2022, NAD announced that T-Mobile should "discontinue claims that T-Mobile Home Internet offers customers consistent speeds over 100 Mbps or modify its claims to provide truthful and accurate information." NAD concluded that T-Mobile was "reasonably conveying the message that a substantial number of customers will achieve average speeds of over 100 Mbps" but that "T-Mobile did not have support for the challenged 100 Mbps claim." NAD also concluded that T-Mobile should modify its claim that customers would get the "best speeds" available among all T-Mobile customers, when that might not be the case. Finally, NAD concluded that T-Mobile was "reasonabl[y] convey[ing]" that "5G internet is available to all eligible customers of T-Mobile," when, in fact, "some consumers may only get 4G LTE service."[4]

17.    On August 18, 2022, NAD announced that T-Mobile's claim that "consumers can 'save up to 50% vs. National FCC Broadband Rate Benchmark'" with T-Mobile's home internet was "unsupported" because "few consumers are paying the $105 a month that T-

---

[4] *National Advertising Division Finds Certain T-Mobile Home Internet Claims Supported; Recommends Others Be Modified or Discontinued*, BBB NATIONAL PROGRAMS: DECISION SUMMARIES (Mar. 17, 2022) (Challenge No. 7066), https://staging.bbbprograms.org/media/newsroom/decisions/tmobile-home-internet-claims.

Mobile uses as its basis for comparison."[5] This decision was issued in response to a complaint by Verizon.

18.    That same day, NAD announced similar determinations about T-Mobile's "Save up to 50%" representation, this time in response to a complaint from Charter.[6]

19.    On November 15, 2022, NAD announced a recommendation that T-Mobile discontinue several claims that: (i) customers would receive a "Price Lock Guarantee"; (ii) swapping to T-Mobile Magenta Max could get a customer's family $1,000; and (iii) families with T-Mobile save 20% versus AT&T. "NAD determined that the Price Lock Guarantee claim was unsupported," and found that "reasonable consumers may not understand the meaning of 'price' within the context of the Price Lock Guarantee claim." NAD also found that T-Mobile's ads "reasonably convey the message that a typical consumer who switches to T-Mobile's Magenta Max plan is eligible to get $1,000" without disclosing that a customer had to have 5 lines to be eligible. NAD also concluded that "there was nothing in the record to

_____

[5]    *National Advertising Division Finds T-Mobile Home Internet Availability Claim Supported, but Recommends "Save Up to 50%" Claim be Discontinued*, PR NEWSWIRE (Aug. 18, 2022) (Challenge No. 7103), https://www.prnewswire.com/news-releases/national-advertising-division-finds-t-mobile-home-internet-availability-claim-supported-but-recommends-save-up-to-50-claim-be-discontinued-301608276.html.

[6]    *National Advertising Division Finds T-Mobile Home Internet Availability Claim Supported, but Recommends 'Save Up to 50%' Claim be Discontinued*, BBB NATIONAL PROGRAMS: DECISION SUMMARIES (Aug. 18, 2022) (Challenge No. 7105), https://bbbprograms.org/media/newsroom/decisions/tmobile-home-internet.

support the broad 20% savings claim when choosing any T-Mobile plan over any AT&T and Verizon plans."[7]

20.    On January 23, 2023, NAD announced its recommendation that T-Mobile discontinue claims that its internet was "fast" and "high-speed" to avoid conveying a message that it would be fast for all customers. It also concluded that T-Mobile should discontinue its claim that its internet was "reliable" because it "determined that the 'reliable' claim implies service dependability akin to wired home internet service, which requires more robust support than T-Mobile provided."[8] In May 2023, the NARB also issued a release indicating that T-Mobile should modify these representations.[9]

---

[7]    *National Advertising Division Recommends T-Mobile Modify or Discontinue Certain TV Commercial Claims for Magenta Max Wireless Service Plan*, LEXOLOGY (Nov. 15, 2022) (Challenge No. 7127), https://www.lexology.com/library/detail.aspx?g=eec56847-1dd5-4052-babb-688b2d7ba9d9.

[8]    *National Advertising Division Finds Certain Claims for T-Mobile Home Internet Supported; T-Mobile Appeals Determination That Certain Claims Were Unsupported*, BBB NATIONAL PROGRAMS: DECISION SUMMARIES (Jan. 23, 2023) (Challenge 7140), https://staging.bbbprograms.org/media/newsroom/decisions/tmobile-home-internet-appeal.

[9]    *National Advertising Review Board Recommends Modifications to T-Mobile Home Internet "Fast," "High-Speed," and "Reliable" Claims*, BIG NEWS NETWORK (May 26, 2023) (Case No. 7140) https://www.bignewsnetwork.com/news/273843038/national-advertising-review-board-recommends-modifications-to-t-mobile-home-internet-fast-high-speed-and-reliable-claims.

21.    On March 23, 2023, NAD announced its recommendation that T-Mobile "discontinue advertising claims that its wireless service has the most reliable 5G network according to the third-party testing company, umlaut." It concluded that umlaut's tests for 5G transaction success were "not a good fit" for T-Mobile's reliability claim.[10]

22.    On April 25, 2023, NAD announced its recommendation that T-Mobile discontinue the claim "Don't you worry 'bout speed," because it "conveys a message that consumers can get the speed they need to do whatever they want on the internet without limitation." NAD concluded that "T-Mobile's evidence was not a good fit for its broad unqualified performance claim."[11] This case was brought by Comcast Cable Communications Management, LLC.

---

[10]    *National Advertising Division Recommends T-Mobile Discontinue Most Reliable 5G Network According to umlaut Claims*, BBB NATIONAL PROGRAMS: DECISION SUMMARIES (Mar. 23, 2023)                    (Challenge                    No.                    7148), https://staging.bbbprograms.org/media/newsroom/decisions/t-mobile-5g-umlaut.

[11]    *National Advertising Division Recommends T-Mobile Discontinue 'Don't You Worry 'Bout Speed' Claim for T-Mobile Home Internet Service*, BBB NATIONAL PROGRAMS: DECISION SUMMARIES (Apr. 25, 2023) (Fast-Track SWIFT Case No. 7201), https://bbbprograms.org/media/newsroom/decisions/tmobile-dont-worry-thint.

23.    On April 25, 2023, NAD issued a second press release reaching the same conclusion regarding the claim "Don't you worry 'bout speed," this time in response to a complaint by Charter Communications, Inc.[12]

24.    On July 27, 2023, NAD announced its finding that T-Mobile should modify its claims that "AT&T customers financing their phone from AT&T are unable to upgrade their phone until expiration of their three-year phone contract." NAD concluded that "this message overstates an AT&T customer's inability to upgrade and the upgrade advantage offered by T-Mobile and is not supported by evidence in the record." NAD also found that T-Mobile's claims for its Go5G Plus Plan were misleading and that, "to avoid conveying a misleading message that T-Mobile will provide a new customer with any of the latest 5G smartphones for free," T-Mobile should disclose its price limitation alongside its phone claim. T-Mobile appealed, and on November 7, 2023, the NARB panel announced that it had "concluded that

---

[12] *National Advertising Division Recommends T-Mobile Home Internet Commercial be Discontinued or Modified to Avoid Implied Message of Fast 5G Speeds*, ICROWDNEWSWIRE (Apr. 25, 2023) (Fast-Track SWIFT Challenge No. 7204), https://icrowdnewswire.com/2023/04/25/national-advertising-division-recommends-t-mobile-home-internet-commercial-be-discontinued-or-modified-to-avoid-implied-message-of-fast-5g-speeds/.

certain T-Mobile upgrade claims . . . are likely confusing to consumers," and agreed with NAD that T-Mobile should modify the Go5G Plus claim.[13]

25.    On August 22, 2023, NAD announced that T-Mobile should discontinue its claim that "conveys a message that T-Mobile customers will be able to watch all regular season [Major League Baseball] games live, whether they are nationally televised games, in-market games, or out-of-market games." This "message is not supported because . . . all games are not available live." "NAD also noted that T-Mobile's 'blackouts and other restrictions apply' disclosure does not cure the challenged claim as it contradicts the main message that all games are available live."[14]

26.    On June 17, 2024, NAD announced its finding that T-Mobile's "Price Lock" claim "does not lock the price but gives consumers one month of free service if certain

---

[13] *National Advertising Review Board Recommends T-Mobile Modify or Discontinue Certain Comparative Phone Upgrade Claims and Modify Other Claims*, BBB NATIONAL PROGRAMS: DECISION SUMMARIES (Nov. 7, 2023) (Challenge No. 7218-319), https://staging.bbbprograms.org/media/newsroom/decisions/t-mobile-phone-upgrade.

[14] *National Advertising Division Recommends T-Mobile Modify or Discontinue Claim About the Ability to Watch Live Major League Baseball Games on MLB.tv*, BBB NATIONAL PROGRAMS: DECISION SUMMARIES (Aug. 22, 2023) (Fast-Track SWIFT Challenge No. 7230), https://staging.bbbprograms.org/media/newsroom/decisions/t-mobile-mlb-tv.

conditions are met." NAD concluded that this "contradicts the main message of the 'Price Lock' claim."[15]

27.     On November 18, 2024, NAD announced its recommendation that T-Mobile "modify or discontinue its claim for a free iPhone and 20% savings on monthly wireless services." T-Mobile appealed. On December 30, 2024, NARB announced its agreement with NAD's analysis and recommendations because "T-Mobile's offers are not clear and conspicuous in the commercial and are unlikely to be communicated to reasonable viewers."[16]

28.     On January 16, 2025, NAD announced its determination that T-Mobile should "discontinue its claim for 20% savings on monthly wireless services." T-Mobile advertised that customers would "save 20% every month in service costs compared to AT&T and Verizon." NAD determined T-Mobile's "on-screen print disclosure that references streaming services as the basis of comparison is insufficient and contradicts the main message of the commercial."

---

[15] *National Advertising Division Recommends T-Mobile Discontinue or Modify 'Price Lock' Claim for 5G Home Internet Service*, BBB NATIONAL PROGRAMS: DECISION SUMMARIES (June 17, 2024) (Fast-Track SWIFT Challenge No. 7332), https://staging.bbbprograms.org/media/newsroom/decisions/t-mobile-price-lock.

[16] *National Advertising Review Board Recommends T-Mobile Discontinue or Modify Commercial to Better Disclose Conditions of Free iPhone Offer, 20% Savings Claim*, BBB NATIONAL PROGRAMS: DECISION SUMMARIES (Dec. 30, 2024) (Fast-Track SWIFT Challenge No 7389), https://staging.bbbprograms.org/media/newsroom/decisions/tmobile-material-conditions.

The commercial "does not put consumers on notice that streaming services are connected with T-Mobile's price comparison claim."[17]

29.    That same day, NAD announced its recommendation that T-Mobile should discontinue its claim that customers could "save on every plan vs. the other big guys." NAD noted that T-Mobile included "the cost of certain third-party streaming services" in its calculation that "consumers are unlikely to expect are included when plan prices are being compared." NAD concluded that some of T-Mobile's plans are more expensive than comparable plans.[18]

30.    On May 19, 2025, NAD announced that it had "found that T-Mobile's updated disclosures fail to clearly and conspicuously inform consumers" about conditions to its statement that consumers who switch to T-Mobile from Verizon could save 20%. The "consumers are not likely to expect the value of ancillary benefits to be included in a savings comparison." T-Mobile appealed, and on July 22, 2025, the NARB "recommended that T-

---

[17] *National Advertising Division Recommends T-Mobile Discontinue "Families Can Save 20% Every Month Versus AT&T and Verizon" Claim*, BBB NATIONAL PROGRAMS: DECISION SUMMARIES (Jan. 16, 2025) (Challenge No. 7406), https://staging.bbbprograms.org/media/newsroom/decisions/t-mobile-families-save.

[18] *National Advertising Division Recommends T-Mobile Discontinue "Save On Every Plan vs. The Other Big Guys" Claim*, BBB NATIONAL PROGRAMS: DECISION SUMMARIES (Jan. 16, 2025) (Challenge No. 7407), https://bbbprograms.org/media/newsroom/decisions/t-mobile-att-other-big-guys.

Mobile modify its advertising to avoid certain unsupported implied claims." The addition of "plus streaming services," or "plus streaming," is "confusing, unclear, and inadequate to accurately communicate the nature of the price comparison."[19]

### III.    NAD has been unwilling or unable to restrain T-Mobile's actions.

31.    NAD is supposed to provide a dispute resolution forum focused on the truthfulness and accuracy of national advertising to build consumer trust in advertising and support fair competition in the marketplace.

32.    At NAD, consumers or organizations—most often competitor companies—bring challenges against advertisers' national ads, alleging that specific claims are false, misleading, or unsubstantiated.

33.    Participation in NAD is voluntary, and NAD has no authority to issue binding decisions or award monetary relief.

34.    Appeals go to the NARB, and advertisers that refuse to participate or comply are supposed to be referred to the Federal Trade Commission. NAD's procedures provide that, to the extent the NARB concludes that an advertiser's claim should be discontinued or modified and the advertiser does not comply, the NARB Chair "*will* issue a decision indicating

---

[19] *National Advertising Review Board Recommends T-Mobile Discontinue Certain Express Savings Claims for its Mobile Telephone Service*, BBB NATIONAL PROGRAMS: DECISION SUMMARIES (Aug. 16, 2025) (Challenge No. 7415), https://bbbprograms.org/media/newsroom/decisions/t-mobile-savings.

that the full record on the case *will* be referred to the appropriate government agency." As relevant to this case, the FTC is the appropriate government agency.

35. Certain single-issue challenges can proceed along a "fast track" program known as "SWIFT."

36. NAD is designed to serve a noble purpose. Unfortunately, its efficacy and utility have declined due to abuse by some participant companies. While market participants acting in good faith keep their advertisements honest and respect NAD's decisions, those like T-Mobile who wish to run deceptive advertisements have been able to circumvent NAD's intended purpose by not fulfilling their end of the voluntary cooperation framework. NAD's unwillingness or inability to consistently enforce its own procedures and deadlines has facilitated this gamesmanship.

37. Advertisers who are intent on preserving the benefits of false or misleading campaigns have learned to exploit weaknesses in NAD's process—delaying corrective action—knowing that NAD rarely enforces its own procedures or refers cases to the FTC.

## IV. AT&T's press release and advertising campaign permissibly highlight T-Mobile's wrongdoing.

38. On October 24, 2025—one day after AT&T began its recent advertising campaign that, among other things, calls attention to T-Mobile's track record of deception—

NAD sent AT&T a cease-and-desist letter demanding that it discontinue the campaign by that evening.

39.     Later the same day, NAD put out a press release accusing AT&T of violating its procedures and implying that AT&T had mischaracterized NAD's decisions. NAD's inflammatory and baseless accusations have now intimidated multiple TV networks into pulling AT&T's advertisement.

40.     As justification, NAD contends that its procedures prohibit anyone who has ever participated in a proceeding from making a "press release regarding any decision issued." NAD further argued that AT&T's advertisement was an attempt to "mischaracterize any decision, abstract or press release issued or use and/or disseminate such decision, abstract or press release for advertising and/or promotional purposes."

41.     The letter was sent via email to Mr. Takehiko Suzuki and Mr. Thomas Ishmael. It does not cite by number any specific procedures that NAD claims were violated, but it includes quotes or paraphrases of its procedures that NAD apparently believes were violated.

42.     First, NAD refers to a procedure that prohibits "issu[ing] a press release regarding any decision issued." This appears to refer to Section 2.1(I)(2)(a) of NAD's procedures, which provides that, "[b]y participating in an NAD or NARB proceeding, the parties agree . . . not to issue a press release regarding any decisions issued."

43.     Second, NAD's letter appears to refer to Section 2.1(I)(2)(b) of its procedures, which says that a party will not "mischaracterize any decision, abstract or press release issued or use and/or disseminate such decision, abstract or press release for advertising and/or promotional purposes."

44.     AT&T's truthful and accurate press release and advertising campaign do not violate either provision.

45.     As to Section 2.1(I)(2)(a), its meaning is clear in context: When NAD or NARB issues a decision, no party is allowed to issue a press release to announce that decision. Instead, NAD issues its own press release to announce the decision. AT&T did not issue a press release to announce any decision, and indeed its advertisements (and press release announcing its advertising campaign) do not mention any particular NAD decision. In fact, AT&T's press release does not use the word "decision" at all.

46.     Instead, AT&T's press release about its new advertising campaign accurately mentions in a single sentence that NAD "asked T-Mobile to correct their marketing claims 16 times over the last four years." Because NAD itself issues press releases concerning its decisions, AT&T's claim—which constitutes only a small portion of its press release—simply aggregates matters of public record. AT&T's press release about its new advertising campaign is therefore not a press release about an NAD decision as contemplated by Section 2.1(I)(2)(a).

47.     As to Section 2.1(I)(2)(b), AT&T has also not violated NAD's procedure.

48.    First, because AT&T's advertising campaign is completely accurate, it does not even arguably "mischaracterize" any "decision."

49.    Second, AT&T has not "use[d]" or "disseminate[d]" any "decision, abstract or press release for advertising and/or promotional purposes." "Decision," "abstract," and "press release" all refer to written documents authored and issued by NAD. Neither AT&T's press release nor its advertising campaign quote from or cite specifically to any decision, abstract, or press release, attribute any specific statements to BBB National Programs or NAD, or otherwise incorporate any NAD-issued document.

50.    In addition, the television advertisements do not *reference* any decision, abstract, or press release. They merely reference "challenge[s]" to T-Mobile's advertising. So the ads cannot possibly violate Section 2.1(I)(2)(b). And the permissibility of press releases is not governed by Section 2.1(I)(2)(b), which applies to uses "for advertising and/or promotional purposes." Restrictions on party press releases are specifically governed by Section 2.1(I)(2)(a), so Section 2.1(I)(2)(b) does not restrict party press releases at all.

51.    Ironically, NAD claims that AT&T's alleged failure to adhere to both the spirit and letter of their procedures undermines its mission to promote truth and accuracy of advertising claims and foster consumer trust in the marketplace. Yet, it was NAD's repeated failure to take action against T-Mobile's disregard of these same procedures that created the need for AT&T to set the record straight.

52.     AT&T has long urged NAD to take action against T-Mobile to promote compliance, including by making referrals to the FTC. In addition to simply asking NAD to adhere to its own existing referral policy—which NAD has repeatedly failed to do—AT&T has also urged NAD to adopt expanded fast-track adjudication procedures and implement more robust compliance monitoring to ensure that advertisers meaningfully adhere to NAD's decisions. And AT&T has repeatedly raised concerns with NAD about the erosion of NAD's effectiveness and T-Mobile's continual defiance of NAD's decisions. In multiple separate proceedings, AT&T has observed firsthand how repeated findings of deception—particularly against T-Mobile—have produced little meaningful deterrence. As NAD has faltered, AT&T has grown increasingly concerned that false and misleading advertising is distorting the marketplace, eroding consumer trust, and harming lawful competitors.

53.     AT&T brings this declaratory judgment action not only because NAD is wrong to assert that AT&T's press release or advertising campaign violate its procedures, but also because AT&T stands for truth and consumer transparency in the face of NAD's ineffectual process.

## COUNT I
## Declaratory Judgment—No Violation of NAD Procedures

54.     Plaintiff incorporates the previous paragraphs as if fully restated herein.

55.     NAD's cease-and-desist letter and press release claim that AT&T's TV advertisement and press release violate NAD procedures. NAD is wrong on both counts.

56.     First, Section 2.1(I) provides that "[b]y participating in an NAD or NARB proceeding, the parties agree" to follow certain procedures relating to decisions, abstracts, or press releases that NAD issues in the proceeding. The clause refers only to parties in a specific NAD proceeding and restricts how they may use that resulting decision or press release in their own promotional materials. It does not prohibit any company that has ever participated in an NAD proceeding from referring to any publicly issued NAD press release or decision—including those from proceedings in which the company was never a party.

57.     NAD's contrary reading—that any participation in an NAD proceeding at any point in the past imposes a perpetual gag order regarding mere reference to any public NAD decision in promotional materials—is too broad to be right. NAD's reading is even more untenable considering that NAD itself disseminates all its decisions into the public domain. *See supra* Background Part II.

58.     Second, AT&T is entitled to a declaration that its television advertisement does not violate either provision cited by NAD. The TV commercial states that T-Mobile is the "Most Challenged for Deceptive Ads" based on "advertising challenges of telecommunications providers brought by competitors from 2022-2025." This advertisement cannot violate Section 2.1(I)(2)(a)'s prohibition on "press releases regarding any decision issued" because a television

commercial is not a press release. Section 2.1(I)(2)(a) by its plain terms applies only to press releases, not television advertising.

59.    Nor does the advertisement violate Section 2.1(I)(2)(b)'s prohibition on using or disseminating NAD "decision[s], abstract[s] or press release[s] for advertising and/or promotional purposes." The advertisement does not mention NAD; does not even identify NAD as the forum where challenges occurred; does not reference any NAD decision, abstract, or press release; and does not describe the outcome of any specific challenge. The advertisement states only that challenges exist, without referencing NAD or any NAD work product. Section 2.1(I)(2)(b) prohibits parties to an NAD proceeding from *mischaracterizing* or using NAD's decisions in that proceeding for advertising purposes; it does not prohibit factual statements about the mere existence of advertising challenges that make no reference to NAD whatsoever.

60.    Additionally, AT&T's advertising claims are true, so AT&T has not "mischaracterize[d]" any decision.

61.    Third, AT&T is entitled to a declaration that its press release likewise does not violate NAD's procedures. AT&T's press release contains one sentence referencing the number of times T-Mobile has been asked to correct its marketing claims. That information does not relate to any proceeding before NAD or NARB to which AT&T is currently a party. Instead, it merely aggregates factually accurate information about T-Mobile's past proceedings that

NAD has *already* disseminated into the public domain. And it does so in the context of a multi-page press release centered around a new advertising campaign. It is not a "press release" "regarding" a "decision" as contemplated by Section 2.1(I)(2)(a). Moreover, AT&T did not initiate several of the proceedings against T-Mobile included in the one-sentence reference; AT&T thus was not a party in those proceedings and could not have agreed to any procedures with respect to those proceedings.

62.     Nor does the press release violate Section 2.1(I)(2)(b). Under this provision, "parties" may not "mischaracterize" any decision or "use and/or disseminate such decision, abstract or press release for advertising and/or promotional purposes." Again, AT&T's advertising claims are true. So AT&T has not in any way "mischaracterize[d]" any decision.

63.     Likewise, AT&T has not, as a party to a NAD proceeding, "use[d] and/or disseminate[d]" any "decision, abstract or press release for advertising and/or promotional purposes" in such a proceeding. Those terms all refer to specific documents written and issued by NAD or the NARB. AT&T's press release does not include, attach, copy, or even cite any specific decision, abstract, or press release either in part or in whole.

64.     Additionally, AT&T's press release falls outside the scope of Section 2.1(I)(2)(b) because Section 2.1(I)(2)(a) governs when a press release is permitted; Section 2.1(I)(2)(b) is, by its terms, directed at use for advertising and promotion.

65.    Contrary to BBB National Programs' claim, AT&T has not used or disseminated any decision, abstract, or press release.

66.    AT&T is entitled to a declaration that it did not violate NAD's procedures. To the extent NAD's procedures are ambiguous with respect to whether they prohibit AT&T's press release and advertisements, those procedures should be construed against NAD as the drafter of its own procedures and, as a result, construed to permit AT&T's conduct.

67.    An actual controversy has arisen as to whether AT&T has violated NAD procedures.

68.    Under 28 U.S.C. § 2201, AT&T is entitled to a declaration that it has not violated NAD procedures.

## COUNT II
### Declaratory Judgment—NAD's Procedures are Unenforceable

69.    Plaintiff incorporates the previous paragraphs as if fully restated herein.

70.    NAD's procedures are unenforceable against AT&T.

71.    AT&T has not signed any valid and binding contract requiring it to adhere to NAD procedures. Nor has AT&T adequately expressed consent given the circumstances.

72.    To the extent the procedures at issue are a condition of participation in NAD proceedings, they do not impose a perpetual vow of silence on a past participant's reference to publicly available materials that NAD publishes. If NAD's procedures were ever binding on

AT&T, their binding effect ceased at the conclusion of the proceeding or a reasonable time thereafter.

73.    Alternatively, to the extent the procedures are a condition of participation in NAD proceedings, they apply only to proceedings in which a party has itself participated. AT&T was not a party to several of the challenges involving T-Mobile referenced in AT&T's advertisements and press release. There is no plausible reading of the NAD procedures that could prohibit AT&T from referencing publicly available outcomes to proceedings of which it was not a party.

74.    An actual controversy has arisen as to whether NAD's procedures are enforceable against AT&T.

75.    Under 28 U.S.C. § 2201, AT&T is entitled to a declaration that NAD's procedures are unenforceable against it.

## COUNT III
### Declaratory Judgment—First Amendment

76.    Plaintiff incorporates the previous paragraphs as if fully restated herein.

77.    Any request by BBB National Programs for a court order requiring AT&T to take down its true and factually accurate advertising based on publicly available information would invite a violation of the First Amendment. *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964).

78.    The "chief purpose" of the First Amendment is "the guaranty to prevent previous restraints upon publication." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931). Prior restraints are "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

79.    Court orders prohibiting speech are "classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550 (1993).

80.    Any request by BBB National Programs for a court order requiring AT&T to cease disseminating its press release and advertising campaign—as BBB National Programs' cease-and-desist letter demands—could not be granted without violating the Constitution's prohibition on prior restraints. *See Near*, 283 U.S. at 713; *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419-20 (1971); *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 579 (5th Cir. 2005).

81.    Though private parties may sometimes agree to restrict disclosure of confidential information, those restrictions do not extend to information already in the public domain. *See Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 611-13 (5th Cir. 2011) (discussing trade-secrets). Here, NAD itself published the speech it now seeks to restrict.

82.    In any event, for the reasons stated in Count I and Count II, AT&T is not bound by any NAD procedure or agreement that may restrict speech regarding already-public information.

83.    An actual controversy has arisen as to whether BBB National Programs can seek to have a court issue an order requiring AT&T to take down its press release or prohibiting AT&T from airing advertisements before the advertisements are aired.

84.    Under 28 U.S.C. § 2201, AT&T is entitled to a declaration that it cannot be enjoined to remove its press release or advertising consistent with the First Amendment.

## PRAYER FOR RELIEF

AT&T respectfully requests that judgment be entered in its favor and against Defendants and declare that:

    a)    AT&T's advertisement and press release do not violate NAD procedures;

    b)    NAD's procedures are unenforceable against AT&T;

    c)    The First Amendment prohibits BBB National Programs from obtaining an injunction requiring AT&T to take down its press release or end its advertising campaign;

    d)    Granting all other relief that the Court deems just and proper.

Respectfully submitted,

**REESE MARKETOS LLP**


By: */s/ Pete Marketos*
      Pete Marketos
       State Bar No. 24013101
       pete.marketos@rm-firm.com
      Tyler J. Bexley
       State Bar No. 24073923
       tyler.bexley@rm-firm.com
      William J. Hamilton
       State Bar No. 24110808
       will.hamilton@rm-firm.com

      750 N. Saint Paul St., Suite 600
      Dallas, Texas 75201
      Telephone: (214) 382-9810

**ATTORNEYS FOR PLAINTIFF AT&T MOBILITY LLC**